2016 IL App (2d) 130514
No. 2-13-0514
Opinion filed April 26, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-1078 |
| ERIC L. NIXON, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices McLaren and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Lake County, defendant, Eric L. Nixon, was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2012)) and being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2012)). Pursuant to one-act, one-crime principles, the trial court entered a conviction on only the latter offense and sentenced defendant to a prison term of 24 years. Defendant appeals his conviction, raising two issues. First, defendant argues that he was denied a fair trial because the trial court erroneously admitted testimonial and photographic evidence regarding his involvement in a shooting that occurred six years prior to the incident at bar. Second, defendant contends that his sixth amendment right to confront the witnesses against him (U.S. Const., amend. VI) was violated because the trial court

admitted testimonial hearsay statements on which he had no opportunity to cross-examine the declarant. We affirm.

¶ 2                                                  I.  BACKGROUND

¶ 3     On May 2, 2012, defendant was charged by indictment with one count of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2012)), one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2012)), one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2012)), and one count of unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)). The charges stemmed from an April 11, 2012, incident in which defendant was alleged to have gone to the residence at which Candice Bradley, the mother of two of defendant's children, was staying and fired a gun in the direction of the building, with the bullets striking the tires of Bradley's unoccupied vehicle. At the arraignment, defendant was ordered to have no contact, directly or indirectly, with various individuals, including Bradley, Kayla Chattard (Kayla), Regina Chattard (Regina), and defendant's codefendant, Dion Buckley.

¶ 4     On October 29, 2012, after learning that Bradley would be evicted from her residence and that her mother would be taking her to Wisconsin, the trial court issued a body attachment for Bradley at the State's request. Because Bradley was not picked up on the body attachment, the State elected to initially try defendant on driving offenses unrelated to the charges at issue. As of March 2013, the body attachment remained outstanding and unserved.

¶ 5     Prior to trial on the charges at issue, the State filed a motion *in limine* seeking to admit evidence of other bad acts allegedly committed by defendant. Specifically, the State sought to admit evidence regarding a November 2006 incident in which defendant shot Bradley during an argument, causing injury to her shoulder and finger. As a result of this incident, defendant was

charged with aggravated battery with a firearm and unlawful possession of a weapon by a felon. Defendant entered a negotiated plea to a charge of attempted aggravated discharge of a firearm, in exchange for a prison sentence of eight years. The State indicated that evidence regarding these prior offenses was relevant to explain "the history between the defendant and [Bradley] as well as put the crime in context *** [and] to prove intent, motive and absence of mistake." The State also argued that the evidence was admissible pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2012)).

¶ 6     In ruling on the State's motion, the court noted that section 115-7.4 of the Code allows the admission of "propensity evidence" in domestic-violence cases. See *People v. Dabbs*, 239 Ill. 2d 277 (2010). In sharing children and remaining in contact, the court found, defendant and Bradley had a "family or household relationship." The court then examined the conduct with which defendant was charged in 2006 and 2012 and determined that his conduct constituted acts of domestic violence for purposes of section 115-7.4. Moreover, the court found that the evidence of the 2006 shooting provided "more than just motive." It explained "an otherwise inexplicable act," *i.e.*, "why would the defendant go to [Bradley's] address and shoot at it." Accordingly, the court found that the probative value of the other-crimes evidence was not substantially outweighed by the danger of prejudice to defendant. To preclude the other-crimes evidence from becoming the focus of a trial-within-a-trial, the court admitted the evidence only "to the extent necessary to place [the instant] offense in context" and to explain motive, relationship, intent, and "an otherwise inexplicable act." Further, while the court permitted the State to introduce the other-crimes evidence, it determined that the State could not present evidence that defendant was convicted of any offense related to that shooting.

¶ 7 The State also filed a pretrial motion *in limine* seeking the admission, pursuant to the forfeiture-by-wrongdoing doctrine (see Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)) of Bradley's hearsay statements regarding the instant offenses. Specifically, the State alleged that, while incarcerated in the Lake County jail, defendant made telephone calls to his girlfriend, Megan McGowan, and to his brother (and Regina's stepson), Albert "A.J." Richard (A.J.), in which he discussed potential witnesses, including Bradley, Kayla, and Regina. According to the State, throughout these conversations, defendant directed A.J. and others to talk to these witnesses and ensure that they would not appear for trial. Following a hearing on the motion, during which the State presented audio recordings of defendant's conversations from jail and the testimony of Paul Kehrli, a detective with the Zion police department, the court granted the State's motion. The court determined that the State satisfied its duty to make a good-faith effort to locate and produce Bradley for trial. The court further found that the State established by a preponderance of the evidence that defendant's conduct constituted forfeiture of his right to confrontation regarding Bradley.

¶ 8 At defendant's trial, Derek Zaloudek, an officer with the Zion police department, testified that during the early morning hours of April 11, 2012, he was dispatched to 2302 Horeb Avenue in response to a disorderly conduct call. Upon his arrival, Zaloudek spoke with Regina, the homeowner. In response to his conversation with Regina, Zaloudek and other officers searched the area for 10 to 15 minutes in an unsuccessful attempt to locate defendant. Approximately 60 to 90 minutes later, at about 3 a.m., Zaloudek returned to the same address in response to another complaint. When Zaloudek arrived, Regina was standing on the front porch of the house and there was a green Chevrolet Malibu, with its engine running, in the driveway. Zaloudek approached the vehicle and observed two occupants, one in the front seat and the other in the

backseat. Zaloudek identified the individual in the front seat as Buckley and the individual in the backseat as defendant. According to Zaloudek, Buckley was "calm and cooperative," while defendant appeared intoxicated and upset with Regina. Defendant yelled back toward the house as he was escorted to a patrol vehicle for arrest on the disorderly conduct complaint. At the police station, Zaloudek spoke to defendant, explaining the charges against him and informing him of when he would be required to appear in court. Although defendant was upset about the charges, he told Zaloudek that "it was good that it happened because it kept him from doing something stupid." Defendant was released from custody at about 7 a.m.

¶ 9    Regina testified that she had known defendant for more than 10 years. Regina resided at 2302 Horeb Avenue in April 2012. During the early morning hours of April 11, 2012, Regina was home watching television with her husband and three children. Bradley was also present. At some point, Bradley left the residence. When Bradley returned between 1 and 2 a.m., she appeared agitated and upset. Bradley then went to bed. A short time later, defendant entered the home, asking to speak with Bradley. According to Regina, defendant also appeared agitated. Regina's husband told defendant that he would call the police if defendant did not leave. Defendant refused to leave, so Regina called the police. At that point, defendant left. A short time later, defendant returned to Regina's house and again asked to speak with Bradley. Regina's husband approached defendant and asked him to leave. Regina then called the police, who arrested defendant.

¶ 10    At 11 a.m. that morning, Regina was at the kitchen sink, washing dishes. Through the kitchen window, she observed defendant and Buckley in a car traveling through the alley behind her house. According to Regina, Buckley was driving the car and defendant was in the backseat. The car then stopped in the alley, and defendant reached over from the backseat behind the front

passenger seat and proceeded to shoot four bullets through an open car window. The bullets struck Bradley's vehicle, a white Ford Taurus sedan, which was located behind a garage at the back of Regina's house. Regina called the police, and the recording of her 911 call was played for the jury.

¶ 11    On cross-examination, Regina denied telling A.J. that she was on the kitchen floor when the shooting occurred. Regina admitted that when she was on the telephone with the 911 dispatcher, she asked her niece, Kayla, the color of the vehicle involved in the shooting and the direction in which it was traveling. Regina explained that she was unable to discern the color of the vehicle, because of the way the sunlight was hitting the car. She further stated that she was unable to remember the direction in which the car was traveling, because she was upset and nervous.

¶ 12    Buckley testified that in April 2012 he lived on Joppa Avenue in Zion with his cousins Jordan Williams (Jordan) and Jacob Williams (Jacob). Defendant did not live in the house with Buckley, but he occasionally spent the night there and would sometimes contribute to the rent. Buckley testified that at the time of trial he was not a gang member. However, in April 2012, he was a member of the Four Corner Hustlers. At the same time, Jordan, Jacob, and defendant were members of another gang, the Black P Stones. Buckley acknowledged that the Four Corner Hustlers and the Black P Stones were rival gangs, but he explained that he was able to live with Jordan, Jacob, and defendant because "they are like family to [him], so [they] pretty much look passed [*sic*] all of that."

¶ 13    Buckley testified that on the evening of April 10, 2012, there was a party at the Joppa Avenue house. Among those present were Buckley, Jordan, Jacob, defendant, and Bradley. During the party, Buckley heard defendant and Bradley argue. He also heard Bradley cry. Later,

Buckley drove Bradley to Regina's house, where Bradley decided to spend the night. When Buckley returned to the Joppa Avenue house, defendant was looking for Bradley. According to Buckley, defendant was "pretty upset" that Bradley had not returned to the house. Defendant made several telephone calls before telling Buckley to return to Regina's house to pick up Bradley. Buckley drove defendant to Regina's house in a green Malibu. Defendant sat in the backseat because the front passenger door was damaged. When they arrived at Regina's house, defendant exited the car, went to the back door of the house, and started yelling and kicking the door. Unable to gain access to the house, defendant returned to the car, and Buckley drove him back to Joppa Avenue. During the ride to and from Regina's house, defendant was "very angry, upset." He was using his cell phone, but Buckley did not know whom he was calling. They stayed at the Joppa Avenue house for about 20 minutes. During that time, defendant paced back and forth and was angry. Defendant then told Buckley to take him back to Regina's house. Buckley complied, with defendant again sitting in the backseat of the car.

¶ 14    When they arrived at Regina's house, Buckley pulled into the driveway. Defendant then began arguing with Regina's husband, who had approached the car. Defendant kept saying that he wanted to see Bradley. While the car was still in the driveway, the police arrived. They removed defendant from the car and arrested him. The police then took Buckley's name before telling him he could go home. Buckley returned home and went to sleep. Later that morning, Buckley awoke to defendant banging at his front door. Defendant asked Buckley to take him to a gas station to buy alcohol. Buckley complied, and defendant bought a fifth of vodka. After leaving the gas station, Buckley and defendant returned to the Joppa Avenue house. Defendant thought he had left his cell phone at Regina's house, so he used Jacob's cell phone to call

Regina's husband. Regina's husband told defendant that he could retrieve the phone but that he did not want any problems.

¶ 15    Buckley drove defendant, who had been drinking vodka, to Regina's house to get his phone. When they arrived, Regina's husband brought the phone out and "words were exchanged" about letting defendant see Bradley. Regina's husband would not permit defendant to enter the house, so defendant and Buckley returned to the Joppa Avenue house. While there, Buckley observed defendant in the kitchen, loading a gun magazine. At the time, defendant was angry and intoxicated. Defendant told Buckley that they had to return to Regina's house because he wanted to shoot Bradley's car so she could not leave. Buckley told defendant that he did not want to return to Regina's house. While waving the gun, defendant told Buckley that "it was either [him] or the car." Buckley then got into the green Malibu and drove defendant to Regina's house. Defendant sat directly behind Buckley.

¶ 16    In the car, defendant told Buckley to pull into the alley behind Regina's house. As Buckley drove through the alley, defendant instructed him to slow down in front of Bradley's car. Defendant then told Buckley to stop his vehicle. As Buckley did so, defendant leaned out of the rear driver's-side window and shot at Bradley's car four times. Defendant then told Buckley to drive him back to the Joppa Avenue house. Defendant entered the Joppa Avenue house, but soon left. Fifteen minutes later, defendant returned, pounding on the door. Defendant entered the house and began pacing, saying that the police were "everywhere." When Buckley went outside to move his car, he was arrested.

¶ 17    At the police station, an officer read Buckley *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and Buckley agreed to talk with the officers. Buckley told them that he did not know anything about the shooting. He stated that, where he is from, "snitches get stitches,"

adding that, if he told the police anything, he would be shot. Buckley also expressed that he would get into just as much legal trouble for being the driver as he would for being the shooter. After Buckley returned to a holding cell, he heard defendant speak to him from an adjoining cell. Defendant told Buckley that Buckley "should take the weight or take the case" and that Buckley "would be taken care of if [Buckley took] the case." Defendant told Buckley that defendant had been supporting him and that defendant would continue to support him if he accepted responsibility for the shooting. Moreover, during an earlier conversation at the Joppa Avenue house, defendant told him that defendant had been supporting him, so defendant should not be the one that ever "go[es] down for a crime." Defendant also explained that, because Buckley did not have "a background," he would receive a lighter punishment than defendant. Buckley testified that he felt like he should be loyal to the person who was feeding him, so he told defendant that he would take responsibility for the shooting.

¶ 18 After talking to defendant, Buckley waived his *Miranda* rights and again spoke to the police. At that time, Buckley "put all the blame on [himself]," telling the police that he thought the white car belonged to Kayla, his former girlfriend, and that he shot at the car because Kayla "killed [his] unborn child." He told the police that he had been under the influence of drugs and was not thinking right when he shot at the car. Buckley denied any involvement by defendant in the shooting. Buckley memorialized this version of events in a written statement. At trial, Buckley testified that the statements he provided the police were not true. He stated that he had not been under the influence of drugs, he never saw Kayla drive a car, and Kayla never became pregnant by him.

¶ 19 Buckley testified that when he returned to the holding cell he told defendant that he had confessed to the shooting. The police later drove Buckley to Regina's house and asked him to

provide specific information about the shooting. Buckley told the police that he discharged the gun through the rear window of the car, even though he had been driving. The police indicated that they did not believe Buckley. After returning to the police station, Buckley told the officers that it was defendant who had shot at the car. Buckley testified that, as a result of his involvement in this case, he was charged with various offenses. Buckley eventually entered a plea to one count of unlawful possession of a controlled substance, as a result of drugs found at the Joppa Avenue house. In exchange for his plea and truthful testimony, Buckley received a sentence of probation.

¶ 20    Brian Barber, an evidence technician with the Zion police department, testified that he retrieved a shell casing from the crime scene at Horeb Avenue and photographed the bullet holes in the car. The car was then towed to the police station for further testing. Barber did not take any measurements of the recovered shell casing's location in relation to the car. Gary Lind, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, testified that he studied the recovered shell casing and determined that it was discharged from a semiautomatic pistol.

¶ 21    Eric Hill, a Zion police officer, testified that he was dispatched to the Joppa Avenue house shortly after 11 a.m. on April 11, 2012. During the investigation at the house, Hill observed defendant trying to exit through a window. Hill instructed defendant to remain still. Hill and another officer then took defendant into custody.

¶ 22    Kehrli testified that he was assigned to investigate the shooting. To that end, at approximately 11:45 a.m. on April 11, 2012, Kehrli went to the Joppa Avenue house. When he arrived, he was directed to Regina's house, where he spoke to Regina, Regina's husband, Kayla, and Jacob. Kehrli brought Regina and Kayla to the police station, where they provided formal

statements. Kehrli then assisted in the execution of a search warrant at the Joppa Avenue house, which resulted in the recovery of drugs and an empty ammunition box. Kehrli also searched the green Malibu, but did not recover any evidence. During the investigation, Kehrli noticed a bullet hole in the front-passenger wheel well of Bradley's vehicle. Upon further examination, he observed a bullet fragment lodged behind the wheel-well fender.

¶ 23 Kehrli sought to interview Bradley, but she was not present at Regina's house when he spoke with the other witnesses. Kehrli eventually located Bradley by contacting several of her friends. Bradley refused to go to the police station to speak with the police, but she suggested meeting at a local restaurant. At approximately 1 p.m. on April 12, 2012, Kehrli, accompanied by Detective Labonne, went to the restaurant. A short time later, Bradley entered. At Bradley's request, Kehrli and Labonne, who were sitting at a table near the front of the restaurant, moved to a table away from the windows, because Bradley was "a little bit apprehensive about sitting *** in view of people walking by." Bradley told Kehrli that she had known defendant for 11 years, she had two children with him, and they had recently got back together after being apart. Bradley related that in 2006 she and defendant had an argument during which defendant shot her in the arm and finger. She also told Kehrli that defendant was a high-ranking member of the P Stone Nation street gang. Bradley added that she was tired of being oppressed by defendant and was determined to take a stand against him.

¶ 24 Bradley told Kehrli that, prior to the shooting, she was at the Joppa Avenue house. Buckley drove her from the Joppa Avenue house to Regina's house after she got into an argument with defendant. Subsequently, Bradley received numerous phone calls from defendant asking her to return to the Joppa Avenue house. After Bradley refused, defendant told her that he would come get her. When defendant arrived at Regina's house, he called and asked Bradley

to let him in. Bradley refused, so defendant entered the house on his own. Bradley heard defendant try to go upstairs, where she was located, but Regina's husband stopped him. Defendant fled after Regina called the police. Thereafter, Bradley continued to receive phone calls from defendant and he returned to Regina's house. The police were again called, and defendant was taken into custody.

¶ 25    However, at about 7 a.m. on the morning of April 11, Bradley heard defendant inside Regina's house. At that time, Bradley was upstairs because she did not want to see defendant. She then received between 20 and 30 telephone calls from defendant. At 10:48 a.m., defendant called Bradley and stated that he was at a liquor store and would be at Regina's house in three minutes. At 10:58 a.m., Bradley received another call from defendant, but she did not answer it. Shortly thereafter, Bradley heard three or four gunshots and Regina yelling. Bradley did not see what happened. Bradley provided a written statement to the police.

¶ 26    Kehrli also testified that he and Detective Cabalquinto interviewed Buckley at the police station on the day of the shooting. Kehrli described Buckley's demeanor during the initial interview as "forlorn" and "defeated." According to Kehrli, Buckley was "looking down and not able to look [him] in the eye." The following day (April 12), Kehrli interviewed Buckley again. Kehrli testified that during the second interview Buckley "wasn't able to maintain a straight face." He chuckled at some points and could not look Kehrli in the eye. Kehrli added that "it seemed like [Buckley] was conflicted about the words that he was actually telling [him]." During the second interview, Buckley told Kehrli that he had been the shooter. As a result, Kehrli drove Buckley to Regina's house to have him demonstrate what occurred. Kehrli testified that what Buckley was telling him was "almost physically impossible." When they returned to the police station, Buckley was placed in an interview room. After being informed of his

*Miranda* rights, Buckley provided another statement. According to Kehrli, at that time, Buckley was "more upbeat," he was able to look Kehrli in the eye, and he acted "as if he had a weight off his shoulders." Kehrli added that the third statement was "much more extensive and with a lot more detail."

¶ 27 Michael Gildea of the Zion police department testified regarding the 2006 shooting incident involving defendant and Bradley. Gildea related that at 2:43 a.m. on November 29, 2006, he was dispatched to a Zion address in response to a call reporting an argument and a gunshot. Later, Gildea went to the Midwestern Regional Medical Center, where he encountered defendant and a child in the waiting room. Gildea also saw Bradley, who was in a medical examination room. Bradley had injuries to the middle finger of her left hand and her left shoulder. Bradley told Gildea that defendant shot her during an argument. Over defendant's objections, two photographs of Bradley's injuries were admitted into evidence.

¶ 28 Prior to resting, the State moved to admit certified copies of two prior felony convictions of defendant. The court allowed the exhibits into evidence, but informed the jury that it would not be given the exhibits during deliberations. After the State rested, defendant moved for a directed verdict on all counts. The court granted the motion in part, granting a directed verdict on count III (unlawful possession of a weapon by a felon) and count IV (unlawful possession of a weapon by a member of a street gang). The court denied the motion as it related to count I (being an armed habitual criminal) and count II (aggravated discharge of a firearm).

¶ 29 A.J. was the only defense witness, and he testified that he spoke with Regina in July 2012 about the shooting. At that time, Regina told A.J., "I was standing in the kitchen when I heard shots and got on the floor. I don't know who it was." On cross-examination, A.J. acknowledged that, immediately following the foregoing statement, Regina stated, "but your brother gonna kill

that girl." A.J. testified that, instead of reporting Regina's statement to the police, he went to see defendant's attorney about it. A.J. also acknowledged that he spoke to Bradley, although he denied discussing defendant's case with her. In exchange for his testimony, A.J. stated, he had been given immunity. Further, A.J. admitted that he was convicted of unlawful possession of a controlled substance with intent to deliver in 2007 and unlawful possession of a weapon by a felon in 2009. A.J. also admitted that, at the time of his testimony, he was incarcerated in the Lake County jail on unrelated charges. Following A.J.'s testimony, the defense rested.

¶ 30    The jury was instructed that any evidence that was admitted for a limited purpose should not be considered for any other purpose. The jury was also instructed that evidence that defendant had been involved in offenses other than those charged in the indictment had been admitted "on the issues of the defendant's motive, intent and to explain the relationship of the parties and may be considered by you only for that limited purpose." Following deliberations, the jury returned guilty verdicts on both counts. On May 14, 2013, defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The trial court denied the motion. Following a sentencing hearing, the trial court merged the two counts and entered a conviction on the armed-habitual-criminal offense. The court then sentenced defendant to a term of 24 years' imprisonment. Following the denial of his motion to reconsider his sentence, defendant filed the instant appeal.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, defendant raises two distinct issues. First, defendant argues that he was denied a fair trial because the trial court erroneously admitted testimonial and photographic evidence regarding his involvement in the November 2006 shooting of Bradley. Second, defendant contends that his sixth amendment right to confront the witnesses against him (U.S.

Const., amend. VI) was violated because the trial court admitted Bradley's hearsay statements, which were testimonial and on which he had no opportunity to cross-examine her. We address each contention in turn.

¶ 33                           A. Other-Crimes Evidence

¶ 34    Defendant first argues that he was denied a fair trial when the trial court allowed the State to present other-crimes evidence, which consisted of the testimony of Kehrli and Gildea relating details of the 2006 shooting of Bradley as well as photographs depicting Bradley's injuries from the 2006 shooting.

¶ 35    The term "other-crimes evidence" refers to misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is on trial. *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). As a general rule, evidence of other crimes is not admissible for the purpose of showing the defendant's propensity to commit a crime. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); see Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). Other-crimes evidence is admissible, however, to establish *modus operandi*, intent, identity, motive, absence of mistake, or any other material fact that is relevant to the case other than propensity. *Dabbs*, 239 Ill. 2d at 283; *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); *Illgen*, 145 Ill. 2d at 364-65 (citing *People v. McKibbins*, 96 Ill. 2d 176, 182 (1983)); see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 36    Notwithstanding the general prohibition on the admission of other-crimes evidence to show a defendant's propensity to commit a crime, other-crimes evidence is admissible to prove propensity as provided in sections 115-7.3, 115-7.4, and 115-20 of the Code (725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2012)). See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, even if other-crimes evidence is otherwise admissible, it may be excluded if it is irrelevant or if the risk

of undue prejudice substantially outweighs its probative value. *Dabbs*, 239 Ill. 2d at 289-90; *Donoho*, 204 Ill. 2d at 170; see Ill. R. Evid. 403 (eff. Jan. 1, 2011). The admissibility of evidence is a matter within the sound discretion of the trial court, and the trial court's decision will not be overturned on appeal absent a clear abuse of discretion. *Donoho*, 204 Ill. 2d at 182; *Illgen*, 145 Ill. 2d at 364. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Illgen*, 145 Ill. 2d at 364. A reviewing court "owes some deference to the trial court's ability to evaluate the impact of the evidence on the jury." *Donoho*, 204 Ill. 2d at 186 (quoting *Illgen*, 145 Ill. 2d at 375-76).

¶ 37     In ruling on the State's motion *in limine* seeking to admit other-crimes evidence, the trial court determined that evidence of the 2006 shooting was admissible to explain motive, intent, relationship, and "an otherwise inexplicable act." The trial court also found that evidence of the 2006 shooting was admissible as propensity evidence pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2012)), which allows the admission of other-crimes evidence in domestic-violence cases. Defendant does not dispute that the 2006 shooting constituted an act of domestic violence for purposes of section 115-7.4 of the Code. In addition, he does not dispute that he and Bradley were "family or household members" for purposes of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq*. (West 2012)). However, he argues that the record does not establish the 2012 shooting as an act of domestic violence, so evidence of the 2006 shooting should not have been admitted pursuant to section 115-7.4 of the Code. In particular, defendant asserts that, taken in the light most favorable to the State, the evidence in this case shows that Bradley's car—not her person—was the intended target of the 2012 shooting. According to defendant, the evidence regarding the 2006 shooting unfairly focused the

jury on his propensity to abuse Bradley rather than on the specific facts of the offenses for which he stood trial. Defendant therefore claims that the prejudicial effect of the other-crimes evidence outweighed any probative value. We disagree.

¶ 38    As noted above, section 115-7.4 partially abrogates the general inadmissibility of other-crimes evidence to show propensity, by allowing such evidence on that issue in certain cases. *Dabbs*, 239 Ill. 2d at 285. Section 115-7.4 provides in relevant part that "[i]n a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986, *** evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2012). Section 103(3) of the Act defines "domestic violence" as "abuse." 750 ILCS 60/103(3) (West 2012). "Abuse," in turn, is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2012). Contrary to defendant's argument, an examination of the indictment in this case and the evidence surrounding the charged offenses establishes that the 2012 shooting constituted an act of domestic violence as that term is defined in the Act.

¶ 39    First, we find that the 2012 shooting constituted "physical abuse." For purposes of section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2012)), "physical abuse" includes "knowing or reckless use of physical force" as well as "knowing or reckless conduct which creates an immediate risk of physical harm" (750 ILCS 60/103(14) (West 2012)). In this case, count II of the indictment charged defendant with aggravated discharge of a firearm in that, "while outside a building located at 2302 Horeb *** and with knowledge that [the building] was

occupied, [he] knowingly discharged a firearm in the direction of the building." The evidence presented at trial showed that Bradley was staying at Regina's house, which was located at 2302 Horeb Avenue. The evidence further established that, shortly before the 2012 shooting, defendant went to Regina's house on multiple occasions because he wanted to speak with Bradley. Defendant's attempts to speak with Bradley at Regina's house were impeded, and defendant was eventually taken into police custody. Upon his release, defendant told Buckley that he wanted to return to Regina's house to shoot Bradley's car so that she could not leave the residence. Subsequently, defendant was seen in the backseat of a car traveling through the alley behind Regina's house. The car stopped in the alley, and defendant proceeded to shoot four bullets through an open car window. The bullets struck Bradley's vehicle, which was located behind a garage at the back of Regina's house. Defendant maintains that the evidence supporting the State's claim that he was the shooter establishes that his intent was merely to disable Bradley's vehicle. However, the car was adjacent to Regina's occupied house, thereby creating a risk of physical harm to the occupants of the house, including Bradley. Under these circumstances, the 2012 shooting constituted knowing or reckless conduct creating an immediate risk of physical harm. See *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (discussing harm created by act of firing bullets in the direction of an occupied building). Therefore, it constituted "physical abuse" as defined in the Act.

¶ 40 We also find that defendant's conduct on the day of the 2012 shooting constituted "harassment" as that term is defined in the Act. "Harassment" is "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the [victim]." 750 ILCS 60/103(7) (West 2012). As one court has explained, harassment occurs when an individual

engages in conduct that causes another to be worried, anxious, or uncomfortable. *People v. Reynolds*, 302 Ill. App. 3d 722, 728 (1999). Here, the evidence presented at trial clearly establishes that defendant's conduct in the hours leading to the 2012 shooting subjected Bradley to "harassment."

¶ 41 In particular, the record shows that on the evening of April 10, 2012, Buckley saw defendant and Bradley argue at a party. Buckley also observed Bradley cry. Buckley later drove Bradley to Regina's house, where she was spending the night. According to Regina, when Bradley returned, she appeared agitated and upset. When defendant learned that Bradley had left, he also became upset. Thereafter, defendant repeatedly went to Regina's house, attempting to speak with Bradley. Defendant's attempts to speak with Bradley were unsuccessful, and he was eventually taken into custody by police. Following his release from custody, defendant returned to Regina's house to retrieve his cell phone and again attempted to speak with Bradley. Regina's husband would not allow defendant to enter the house, so defendant left. The shooting occurred a short time later. Following the shooting, Bradley was hesitant to speak with the police. Although she eventually agreed to make a statement, she refused to go to the police station. Instead, she asked to meet at a local restaurant. When Bradley arrived at the restaurant, she asked Kehrli and Labonne to move to a table away from the windows, because, according to Kehrli, Bradley was "a little bit apprehensive about sitting *** in view of people walking by." During her conversation with Kehrli, Bradley related her history with defendant and the events of the 2012 shooting. Thereafter, the State was unable to locate Bradley to testify at trial. A body attachment issued, but Bradley was never taken into custody, and she did not testify. While there was no explicit testimony that the 2012 shooting caused Bradley emotional distress, one can reasonably infer that defendant's conduct caused her to be worried, anxious, and

uncomfortable, given her demeanor following the argument with defendant, her decision not to have any contact with defendant following the argument, her hesitance to speak with the police and be seen in public with them, and the State's inability to locate her to testify at defendant's trial. Accordingly, we reject defendant's claim that the 2012 shooting did not constitute a crime of domestic violence for purposes of the application of section 115-7.4 of the Code.

¶ 42    We are also unpersuaded by defendant's argument that the prejudicial effect of the evidence of the 2006 shooting outweighed any probative value. Section 115-7.4 provides that, in weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4 (West 2012). The trial court determined that the probative value of the other-crimes evidence was not substantially outweighed by the danger of undue prejudice to defendant. A review of the record supports the trial court's determination. First, we note that six years elapsed between the 2006 shooting and the instant offenses. In *Donoho*, 204 Ill. 2d at 184-85, the supreme court noted that, while the passage of 12 to 15 years since the prior offense might have lessened its probative value, standing alone it was insufficient to compel a finding that the trial court abused its discretion in admitting evidence of it. Moreover, in both *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 37, and *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994), the courts found proper the admission of evidence of crimes occurring 20 years prior to the offenses at issue. Here, the number of years between the two events was much less than in *Donoho*, *Braddy*, or *Davis*. Accordingly, we find that the 2006 shooting was close enough in time to the instant offense to be relevant and probative. Second, the factual similarities of the 2006 shooting and the 2012 incident support the admission of the other-crimes evidence.

Significantly, in both cases, defendant responded to an argument with Bradley by discharging a weapon near her. The fact that the 2006 shooting resulted in physical injury to Bradley herself, whereas the 2012 shooting resulted in damage to Bradley's car, does not diminish the factual similarities between the events. See *People v. McCarthy*, 132 Ill. 2d 331, 343-44 (1989) (finding that prior bad act of smashing the car windows of the victim's family members tended to show the defendant's intent to harm the victim); see also *Donoho*, 204 Ill. 2d at 185 (noting that the existence of some differences between the charged offense and the prior offense does not defeat admissibility, because no two crimes are identical). Accordingly, we find no abuse of discretion in the trial court's decision to admit evidence of the 2006 shooting under section 115-7.4.

¶ 43    Defendant does not expressly challenge the admission of the other-crimes evidence for nonpropensity purposes. As a result, we find that he has forfeited any argument in this regard. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (providing that points not argued in the appellant's brief are forfeited); *Allstate Property & Casualty Insurance Co. v. Trujillo*, 2014 IL App (1st) 123419, ¶ 17. Even if this issue had been properly preserved, however, the trial court's finding that evidence of the 2006 shooting was probative of defendant's intent, his motive, and the relationship between Bradley and defendant provided a basis independent of section 115-7.4 for its admission. In this regard, we note that prior attacks upon the same victim are probative of intent, motive, and relationship. *People v. Abraham*, 324 Ill. App. 3d 26, 32-35 (2001); see also *Illgen*, 145 Ill. 2d at 367 (noting that evidence that the defendant physically assaulted his wife throughout their marriage was probative to show their antagonistic relationship). It has also been said that such prior violence against the victim can provide evidence of hostility to show that the defendant is likely to do further violence. *People v. Null*, 2013 IL App (2d) 110189, ¶ 47 (quoting *Illgen*, 145 Ill. 2d at 367). In this case, part of the defense strategy was to persuade the

jury that Buckley, not defendant, was the shooter. Thus, evidence of the 2006 shooting was relevant to establish the antagonistic relationship between defendant and Bradley as well as motive and intent. See *People v. Heard*, 187 Ill. 2d 36, 59-60 (1999) (noting that other-crimes evidence was probative of motive and intent where it established the defendant's continuing hostility and animosity toward the victims); *Illgen*, 145 Ill. 2d at 367 (holding that evidence of prior acts of violence against the victim was relevant to show antagonistic relationship and motive to kill). The evidence of the 2006 shooting established defendant's continuing animosity toward Bradley, his intent to harm Bradley, and a motive—defendant's desire to assert control over his relationship with Bradley.

¶ 44 Moreover, as discussed above, the probative value of the evidence of the 2006 shooting was not outweighed by the danger of unfair prejudice. The 2006 shooting was close enough in time to the instant offenses to be relevant and probative. The 2006 and 2012 shootings also share factual similarities in that Bradley was the victim and they occurred following arguments between defendant and Bradley. In addition, the trial court offered to instruct the jury as to the limited purposes of the other-crimes evidence when the evidence was presented, but defense counsel declined the offer because he did not want to highlight the evidence. Nevertheless, at the conclusion of the trial the trial court instructed the jury as to the limited purposes of the other-crimes evidence. There is a strong presumption that jurors follow the instructions of the court (*People v. Taylor*, 166 Ill. 2d 414, 438 (1995)), and we find nothing in the record to rebut this presumption. We also note that the trial court attempted to mitigate any potential prejudice by limiting the number of photographs admitted of Bradley's injuries. Defendant suggests that the 2006 shooting became the "primary focus of the trial," but there is no evidence to support this claim. The transcript in this case consists of more than 500 pages of testimony. However, the

evidence of the 2006 shooting was limited to Gildea's testimony, which consisted of approximately 11 pages, as well as a small portion of Kehrli's testimony, consisting of about 2 pages.

¶ 45    In short, the record establishes that the trial court considered and meaningfully assessed all the factors required for admitting the other-crimes evidence.  As such, we find that the trial court did not abuse its discretion in admitting the evidence of the 2006 shooting.

¶ 46                              B.  Forfeiture by Wrongdoing

¶ 47    Defendant also claims that his sixth amendment right to confront Bradley was violated when the trial court admitted her hearsay statements.  Defendant asserts that Bradley's statements were testimonial and that he had no opportunity to cross-examine her.  Thus, he contends, the admission of the statements constituted reversible error.  Moreover, defendant asserts that there was no evidence that Bradley was afraid to testify against him as a result of calls or threats he made to her while he was in custody.  Accordingly, defendant asserts, the trial court erroneously admitted Bradley's statements under the forfeiture-by-wrongdoing doctrine (see Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)).

¶ 48    The sixth amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall have the right "to be confronted with the witnesses against him." U.S. Const., amend. VI.  The doctrine of forfeiture by wrongdoing is a common-law doctrine. *People v. Hanson*, 238 Ill. 2d 74, 96 (2010); *People v. Peterson*, 2012 IL App (3d) 100514-B, ¶ 20.  Under this doctrine, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006).  The doctrine was codified at the federal level by Federal Rule of Evidence 804(b)(6), as an exception to the rule against hearsay.  Fed. R. Evid. 804(b)(6); *Davis*, 547 U.S. at 833; *Hanson*, 238 Ill. 2d

at 97. In *Crawford v. Washington*, 541 U.S. 36, 62 (2004), the Supreme Court recognized that, in addition to serving as an exception to the hearsay rule, the doctrine also extinguishes confrontation claims on equitable grounds. See also *Davis*, 547 U.S. at 833. In 2007, the Illinois Supreme Court recognized that the federal rule is coextensive with the common-law doctrine. *Hanson*, 238 Ill. 2d at 97 (citing *People v. Stechly*, 225 Ill. 2d 246, 272-73 (2007)). The Illinois Supreme Court has also recognized that the doctrine serves both as an exception to the hearsay rule and to extinguish confrontation claims. *Hanson,* 238 Ill. 2d at 97.

¶ 49     More recently, our supreme court adopted the Illinois Rules of Evidence, which became effective on January 1, 2011. The Illinois Rules of Evidence codified the existing rules of evidence in this state, including the common-law doctrine of forfeiture by wrongdoing. Illinois Rule of Evidence 804(b)(5) provides an exception to the rule against hearsay for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The reliability of the statement sought to be admitted is not an element of Rule of Evidence 804(b)(5). *Peterson*, 2012 IL App (3d) 100514-B, ¶ 23. When the State raises the doctrine of forfeiture by wrongdoing, it must prove both the wrongdoing and the intent to procure the unavailability of the declarant. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The State's burden of proof is by a preponderance of the evidence. *Stechly*, 225 Ill. 2d at 278.

¶ 50     Defendant contends that the trial court erroneously admitted Bradley's hearsay statements under the forfeiture-by-wrongdoing doctrine. As noted above, a trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182; *Illgen*, 145 Ill. 2d at 364; see also *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 203; *People v. Hampton*, 406 Ill. App. 3d 925, 939 (2010) (deferring to the trial

court's finding that a defendant forfeited his right to confrontation unless the trial court's exercise of discretion was frustrated by an erroneous rule of law). However, as to whether defendant was denied his right to confront the witnesses against him, our review is *de novo*. *People v. Leach*, 2012 IL 111534, ¶ 64.

¶ 51    After reviewing the record in this case, we cannot say that defendant's sixth amendment right to confront Bradley was violated, because the trial court correctly determined that Bradley's hearsay statements were admissible pursuant to the forfeiture-by-wrongdoing doctrine. Significantly, the trial court recognized the hearsay exception provided by Rule of Evidence 804(b)(5), determined Bradley's unavailability as a witness, and found that the State had proven by a preponderance of the evidence that defendant acquiesced in conduct that was intended to, and did, procure her unavailability. Relying primarily on Bradley's interview with Kehrli shortly after the 2012 shooting, defendant contends that Bradley was not afraid of him and that he did not procure her absence. Defendant further avers that phone calls he made to various individuals while he was incarcerated did not contain threats or promises intended to influence Bradley. We disagree.

¶ 52    First, the trial court found that Bradley told Kehrli that she was afraid of defendant and afraid for her life. This finding is supported by Kehrli's testimony at the pretrial hearing on the State's motion *in limine*. Kehrli testified about his meeting with Bradley at the restaurant shortly after the 2012 shooting. According to Kehrli, Bradley told him that she was scared and would not come to the police department under any circumstances. Bradley also told Kehrli that she did not testify against defendant when he shot her in 2006, because defendant would have killed her if she did. Kehrli asked Bradley how defendant could harm her if he was incarcerated. Bradley related that defendant was a gang member. She told Kehrli that the gang had members

in every state, so she would be found no matter where she went. As a result, Bradley felt that she and her children could be harmed if she testified. In addition, Bradley indicated that she turned off her cell phone so she could not be found. Although Bradley spoke to the police, initially agreed to testify, and had not been threatened when she spoke with Kehrli at the restaurant, Kehrli's testimony supports the trial court's finding that Bradley was afraid of defendant. The record also suggests that defendant knew that Bradley was afraid. During a call from jail on May 8, 2012, defendant asked Regina's daughter if Bradley was terrified of him. Regina's daughter responded that Bradley told her that she was afraid of him.

¶ 53    The court also found that defendant was concerned about Bradley's potential testimony in this case. The court noted that defendant acted through McGowan and others to "affectionately affect" witness testimony. The court also found that some evidence showed what could be construed as threats intended to ensure that testimony came out a certain way or did not come out at all through the absence of a witness. Specifically, the court noted that defendant encouraged Bradley to execute an affidavit for the defense. Bradley complied with defendant's request before disappearing. The evidence also supports these findings.

¶ 54    Notably, throughout the recordings of defendant's telephone calls from jail, defendant asked several individuals, including McGowan, Regina's daughter, Jacob, A.J., and an individual named "Mojo" to speak with Bradley and determine whether she was coming to trial. On July 17, 2012, defendant was informed that Bradley was planning to testify. At that time, he urged his contacts to talk to Bradley about his plea negotiations and asked Mojo to "blow" on her. The next day, during a conversation with McGowan, defendant stated that he "can breathe easy now" and that it was a "big *** relief." That same day, defendant learned that Mojo had spoken with Bradley and that she indicated that she would not be coming to trial. On July 23, defendant

spoke directly to Bradley and told her to allow McGowan to take her to his attorney's office to execute an affidavit stating that he did not commit the 2012 shooting. Defendant told Bradley that after his release from jail, she would not have to worry about him. In addition, defendant identified Bradley as the victim and told her what to write. Upon learning that Bradley had agreed to execute an affidavit, defendant remarked, "the Lord is really working miracles." After Bradley executed the affidavit, defendant bragged that he "had to say something for that to happen" and that his word "made a difference" in Bradley's providing the affidavit.

¶ 55    The telephone conversations between defendant and others show a concerted effort on the part of defendant, McGowan, and others to ensure that Bradley did not testify or appear in court. See *Hampton*, 406 Ill. App. 3d at 940-41. Defendant was aware that Bradley was the principal victim and, in the words of the trial court, he engaged in a "friendly inducement" of Bradley from jail. In speaking with Bradley, defendant repeatedly instructed her to go to his lawyer's office and sign an affidavit in his favor. Further, he coached Bradley on what to say in the affidavit. He suggested that Bradley would not need to worry about him if she followed his instructions. Defendant did so in contemplation of his future trial. *Cf. In re Rolandis G.*, 232 Ill. 2d 13, 42 (2008) (finding that " 'pinky swear' " after an assault was not in contemplation of future trial). When defendant knew that Bradley had signed the affidavit, he remarked that he was the one who needed to say something in order for Bradley to do something.

¶ 56    Based on the above, we find that the State established by a preponderance of the evidence that defendant engaged or acquiesced in conduct intended to procure Bradley's absence and render her unavailable to testify against him at trial. Accordingly, we find that the trial court did not abuse its discretion in finding admissible Bradley's hearsay statements to the police.

¶ 57                                III.  CONCLUSION

¶ 58    For the reasons set forth above, we affirm the judgment of the circuit court of Lake County.  As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.  55 ILCS 5/4-2002(a) (West 2012); see also *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 59    Affirmed.