2026 IL App (1st) 230872-U

FOURTH DIVISION
Order Filed: April 2, 2026

No. 1-23-0872

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16CR06983 |
| DESHON JONES, | ) ) | Honorable |
| Defendant-Appellant. | ) ) ) ) | William G. Gamboney, Judge presiding. |

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The circuit court erred by allowing the admission of a witness' testimony through the forfeiture by wrongdoing exception.

¶ 2   Following a jury trial, the defendant-appellant, Deshon Jones, was found guilty of first degree murder and sentenced to 45 years' imprisonment. On appeal, Mr. Jones argues the circuit

court erred by: (1) denying the defense motion for a brief continuance to present the testimony of Jonathan Patino, an eyewitness who did not identify Mr. Jones in a photo array or a lineup and failed to appear in court despite being properly served prior to trial; and (2) allowing the State to present evidence of deceased witness Mutasim Sulieman's identification testimony based on the forfeiture by wrongdoing hearsay exception because no evidence was presented that Mr. Jones was involved in, or even aware of, the planning of Mr. Sulieman's death. For the following reasons, we reverse the conviction of Mr. Jones and remand for a new trial.

¶ 3                                    BACKGROUND

¶ 4      On March 2, 2016, Tommie Pledge was shot and killed inside the Division Quick Stop and Cellular Store located at 3657 West Division Street in Chicago, Illinois. The store was equipped with video surveillance cameras that digitally recorded activity inside and outside the premises. The store owner, Mr. Sulieman reviewed the surveillance footage after the shooting and later met with law enforcement. That same day Greg Swiderek, a detective for the Chicago Police Department, presented a photo array to Mr. Sulieman. Before viewing the array, Mr. Sulieman declined audio and video recording of the administration of the photograph lineup procedure. Mr. Sulieman viewed a six-person photograph array and identified the individual in position number one, writing "Karl" and "he shot Tommy" on the photograph. The identification procedure was documented and inventoried. The investigation led to the arrest of Mr. Jones on April 5, 2016.

¶ 5      On May 9, 2016, Mr. Jones was charged by indictment with first degree murder, aggravated unlawful use of a weapon, and unlawful possession of a weapon stemming from the shooting death of Mr. Pledge. He was arraigned on May 16, 2016, and remained in custody throughout the proceedings. Private counsel later filed an appearance on his behalf.

¶ 6     Mr. Sulieman was shot and killed on May 3, 2019. Following his death, the State filed a motion seeking to admit Mr. Sulieman's prior identification and statements under the forfeiture-by-wrongdoing doctrine. At the forfeiture hearing, the State presented evidence including jail call detail reports, visitor registration records, housing records, and video evidence depicting the shooting of Mr. Sulieman. The jail records reflected calls placed from accounts associated with Mr. Jones and his co-defendant during the period before Mr. Sulieman's death.

¶ 7     After conducting an evidentiary hearing, the circuit court found by a preponderance of the evidence that Mr. Jones had acquiesced in wrongdoing that resulted in Mr. Sulieman's unavailability and granted the State's motion to admit Mr. Sulieman's prior statements.

¶ 8     Mr. Patino, who had been served with a subpoena by investigators from the State's Attorney's Office, failed to appear in court. Mr. Patino was an eyewitness to the shooting. Prior to jury selection, defense counsel asked the court to issue a warrant for Mr. Patino and continue the case so Mr. Patino could be brought to court. Defense counsel made an offer of proof explaining that Mr. Patino had witnessed the shooting, saw the second shooter, and was shown a photo array but did not identify Mr. Jones as the second shooter. Mr. Patino viewed a lineup that included Mr. Jones but he did not identify Mr. Jones. The court issued the warrant but did not grant a continuance despite requests for continuance from Mr. Jones on February 27, February 28, March 1, and March 2, 2023.

¶ 9     The case proceeded to jury trial on February 27, 2023. At the jury trial, the State presented testimony from responding officers and detectives involved in the investigation of Mr. Pledge's shooting. Chicago Police Department Officer Gary McGovern testified that upon arrival at the Quick Stop he observed Mr. Pledge lying on the ground deceased and the officers reviewed the store's surveillance system with Mr. Sulieman. Officer McGovern testified he learned that one

offender was Terran Scott and the other was identified as "Karl BossMan Jones" from a Facebook photograph.

¶ 10    Chicago Police Department Detective Anthony Noradin testified that Mr. Sulieman reported witnessing the shooting and identified both offenders. Detective Noradin stated that Mr. Sulieman provided a screenshot of a Facebook profile identifying Karl "Boss Man" Jones and signed a printed photograph. He further stated Mr. Sulieman showed detectives the store's surveillance footage and burned a copy of the recording to a disk, which was later admitted into evidence and played for the jury.

¶ 11    Chicago Police Department Detective Swiderek testified regarding the administration of the photo array to Mr. Sulieman on March 2, 2016, including Mr. Sulieman's written identification of the individual he stated shot Mr. Pledge. Defense counsel presented evidence concerning Mr. Patino, who viewed a photo array and later a physical lineup but did not identify Mr. Jones.

¶ 12    On March 2, 2023, the jury returned a verdict finding Mr. Jones guilty of first degree murder. On May 5, 2023, the court sentenced Mr. Jones to 25 years' imprisonment for first degree murder and a consecutive 20-year firearm enhancement for a total of 45 years' imprisonment. Mr. Jones filed his notice of appeal on May 9, 2023.

¶ 13                                    ANALYSIS

¶ 14    We note that we have jurisdiction to consider this matter, as Mr. Jones filed a timely notice of appeal. See Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); Ill. S. Ct. R. 606 (eff. Jan. 1, 2026).

¶ 15     Mr. Jones argues the trial court erred in allowing the State to present evidence of deceased witness Mr. Sulieman's identification testimony based on the forfeiture by wrongdoing hearsay exception because no evidence was presented that Mr. Jones was involved in Mr. Sulieman's death.

¶ 16    Illinois Rule of Evidence 804(b)(5) (Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)) codifies the forfeiture by wrongdoing exception, permitting the admission of hearsay statements against a party who engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.   This exception is extremely narrow and requires proof that the defendant engaged in the wrongdoing with the intent to procure the witness' unavailability. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 49. The State bears the burden of proof by a preponderance of the evidence. *Nixon*, 2016 IL App (2d) 130514, ¶ 49. The court's factual findings are reviewed under the manifest weight of the evidence standard, meaning reversal is warranted only if the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v. Thomas*, 2025 IL App (4th) 231504, ¶ 87.

¶ 17    Controlling precedent from both the Illinois Supreme Court and the United States Supreme Court makes it clear that intent to silence the witness is a critical element of forfeiture by wrongdoing. In *Giles v. California*, 554 U.S. 353, 367 (2008), the Supreme Court held that the forfeiture doctrine applies only when the defendant engaged in conduct designed to prevent the witness from testifying. Our supreme court has adopted this requirement, holding that the State must show, by a preponderance of the evidence, that the defendant engaged in or acquiesced in wrongdoing with the specific intent to procure the witness' unavailability. *People v. Chatman*, 2024 IL 129133, ¶ 34. Mere knowledge, passive benefit, or association is insufficient; the defendant must have had in mind the particular purpose of making the witness unavailable. *Giles*, 554 U.S. at 367-68. The doctrine is not satisfied by showing only that the defendant was a co-defendant or associated with the wrongdoer. *Giles*, 554 U.S. at 368.

¶ 18    Further, conspiracy liability may be used to impute intent, but only where there is evidence that the defendant was a participant in an ongoing conspiracy and that the wrongful procurement

of the witness's unavailability was within the scope, in furtherance, and reasonably foreseeable as a consequence of that conspiracy. *People v. Davis*, 2018 IL App (1st) 152413, ¶ 39.

¶ 19    In this case, the State sought to admit the prior identification testimony of Mr. Sulieman, after he was murdered before trial, under the forfeiture by wrongdoing hearsay exception, finding that Mr. Jones "acquiesced" in the wrongdoing. The court found the evidence that Mr. Jones engaged in wrongdoing was "weaker" than the evidence against his codefendant, Mr. Scott, but found acquiescence based on inferences from the record. The State argues that conspiracy liability and circumstantial evidence are sufficient to show the intent or acquiescence of Mr. Jones. Mr. Jones counters there was no evidence he planned, knew about, or intended the murder, and that forfeiture was improperly applied.

¶ 20    We find the record does not contain direct or circumstantial evidence that Mr. Jones planned, knew about, or intended the murder of Mr. Sulieman. The State's evidence consisted primarily of jail calls, but it was not established who made the calls, and the content did not demonstrate intent from Mr. Jones to silence Mr. Sulieman or his participation in any plan to do so. The court's finding of acquiescence appears to have been based on the status of Mr. Jones as a co-defendant in the crime rather than on evidence of intent or participation in wrongdoing. *Giles*, 554 U.S. at 367-68.

¶ 21    The State's reliance on conspiracy liability is unavailing. The record does not support the contention of an ongoing conspiracy involving Mr. Jones to silence Mr. Sulieman. In *Davis*, 2018 IL App (1st) 152413, ¶ 42, this court found evidence supporting the existence of a conspiracy among the defendants and others to commit the shooting at Burnside Park, which resulted in the death of Mark Cooper and the attempted murder of Rakyah Whittier. The evidence included testimony that the shooting was related to an ongoing conflict between rival gangs, and that the

individuals involved were former friends who had split into different gangs. *Davis*, 2018 IL App (1st) 152413, ¶ 42. In that case, the police spoke to Patrick Stribling, who stated he was in the park at the time of the shooting and believed he was one of the intended targets of the shooting. *Davis*, 2018 IL App (1st) 152413, ¶ 4. He spoke to the grand jury and testified that he heard the shooting occur in an alleyway, recognized and identified the defendants as they ran from the alley with one of them still shooting after leaving the alley headed to the park, and described the color and type of vehicle that the defendants used to drive to the alley. *Davis*, 2018 IL App (1st) 152413, ¶ 26. A week after he testified in front of the grand jury, he was murdered. *Davis*, 2018 IL App (1st) 152413, ¶ 4. When Mr. Davis was confronted about the murder of Mr. Cooper and that someone identified him, he kept stating to "bring Pat forward" or "bring Pat in here," referring to Mr. Stribling. *Davis*, 2018 IL App (1st) 152413, ¶ 34. His co-defendant stated in a jail call that the only evidence the police had against him was Mr. Stribling's statement. *Davis*, 2018 IL App (1st) 152413, ¶ 34. In a subsequent jail call, he stated Mr. Stribling **"**made 'that statement on us' and got killed" and " '[t]hat's what his a\*\*\* get." *Davis*, 2018 IL App (1st) 152413, ¶ 34. In the call, he said they shot him the first time, but he was still breathing so they "shot him some more." *Davis*, 2018 IL App (1st) 152413, ¶ 34.

¶ 22    In *Davis*, 2018 IL App (1st) 152413, ¶ 36, the trial court admitted the grand jury testimony of Mr. Stribling under the hearsay exception of forfeiture by wrongdoing. This court affirmed the trial court's ruling, finding that there was an ongoing conspiracy to kill Mr. Stribling. *Davis*, 2018 IL App (1st) 152413, ¶ 42. This court relied on the fact that Mr. Stribling believed he was one of the intended targets in the original shooting and the person charged with his murder was one of the men in the vehicle at the time of the original shooting. *Davis*, 2018 IL App (1st) 152413, ¶ 42.

This court found the murder served as the completion of the original conspiracy. *Davis*, 2018 IL App (1st) 152413, ¶ 42.

¶ 23    In this case, the trial court stated it considered "the relationship between Jones and Scott" and that they were in the same gang. The court also mentioned that there were close ties between the two codefendants since a few individuals showed up on both of their call logs. Citing *U.S. v. Cherry*¸ 217 F.3d 811, 821 (10th Cir. 2000), the trial court stated that the scope of a conspiracy is not necessarily limited to the primary goal but also secondary goals such as evading prosecution or obstructing justice. In its reading of *Cherry*, the court believed that even without actual knowledge or participation, there could still be forfeiture by wrongdoing. To that end, given the closeness of Mr. Jones' circle and Mr. Scott's, the timing of the calls between people they know in common, Mr. Jones' reluctance to speak freely on the phone, and Mr. Scott's conversation, the court believed that finding that Mr. Jones was kept out from the discussions was "extremely implausible." The trial court then cited the Merriam-Webster definition of "acquiesced" as "to accept, agree, or allow something to happen by staying silent or by not arguing." As a result, it found that the State proved by a preponderance of the evidence that it is more likely than not that Mr. Jones acquiesced to the murder.

¶ 24    Unlike *Davis*, 2018 IL App (1st) 152413, ¶ 42, where evidence established an ongoing conspiracy to murder someone and the wrongful act fell within its scope and was a foreseeable consequence thereof, the evidence here does not establish Mr. Jones was a participant in any such conspiracy or that the murder was committed in furtherance of an unlawful agreement. The State's motions referencing a conspiracy were neither filed nor supported by evidence at the hearing, and the trial court made no finding of an ongoing conspiracy involving Mr. Jones. The court's finding that Mr. Jones forfeited his confrontation rights under the forfeiture by wrongdoing exception was

against the manifest weight of the evidence. The State did not prove, by a preponderance of the evidence, that Mr. Jones engaged in or acquiesced to wrongdoing with the intent to procure Mr. Sulieman's unavailability as a witness. The court's reliance on acquiescence and conspiracy theories was inconsistent with controlling authority, which requires proof of intent and, for conspiracy liability, evidence of participation in an ongoing conspiracy with the purpose of silencing the witness. *Nixon*, 2016 IL App (2d) 130514, ¶ 49; *Davis*, 2018 IL App (1st) 152413, ¶ 39.

¶ 25    Moreover, the trial court did not cite any evidence tying Mr. Jones to the murder other than his association with his codefendant, Mr. Scott, and some individuals in Mr. Scott's orbit. The other evidence in context with the rest of the phone calls is ambiguous. Mr. Jones statement about having "good news and bad news" to share could be about anything and the timing of it without more evidence does not make it more likely than not that he acquiesced to the murder of Mr. Sulieman. From the call between Mr. Scott and Ms. Jones, it is possible that Mr. Jones' mother might have known about the plan to kill Mr. Sulieman but there is no record of her communicating that plan to her son. Perhaps, Mr. Jones spoke to Mr. Scott and discussed the plan in person. While we may agree with the trial court that it is unlikely that Mr. Scott created this plan to kill Mr. Sulieman without telling Mr. Jones, that is purely speculation not based on the evidence presented. Even in the *Cherry* case, which the trial court cited, there was no evidence that three of the five codefendants participated in the murder and unavailability of the key witness, and thus, the witness' statement could not be used against them. *Cherry*, 217 F.3d at 821. That case highlights that defendants who benefit from the death of a key witness of the conspiracy do not have to have acquiesced to the murder of that witness. While there is no question Mr. Jones benefitted from the murder, the only evidence presented tying him to the plan to murder Mr. Sulieman was the fact

that Mr. Jones' and Mr. Scott's families and circles seem intertwined and certain vague statements. That is simply not enough. Therefore, we find the court's ruling was against the manifest weight of the evidence, and it erred by admitting evidence of Mr. Sulieman's identification. As a result of this error, we remand the case back to the trial court for a new trial.

¶ 26    Mr. Jones also argues that the circuit court erred by denying the defense motion for a continuance to present the testimony of Mr. Patino. Since we are remanding for a new trial, we need not consider whether the trial court erred by not granting Mr. Jones' motions for continuances.

¶ 27                              CONCLUSION

¶ 28    For the foregoing reasons, the judgment of the Circuit Court of Cook County is reversed. We remand this cause to the circuit court for a new trial consistent with this order.

¶ 29    Reversed and Remanded.