2016 IL App (1st) 151854
No. 1-15-1854
Opinion filed May 11, 2016

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THOMAS TAMRAZ, | ) | Appeal from the |
|  | ) | Circuit Court |
| Petitioner-Appellant, | ) | of Cook County, |
|  | ) | Illinois. |
| v. | ) |  |
|  | ) | No. 15OP20125 |
| CATHERINE TAMRAZ, | ) |  |
|  | ) | The Honorable |
| Respondent-Appellee. | ) | Callie Lynn Baird, |
|  | ) | Judge Presiding. |

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1        Petitioner-appellant Thomas Tamraz sought an order of protection against his cousin, respondent Catherine Tamraz. The trial court entered an emergency order of protection, but ultimately denied Thomas' request for a plenary order of protection. Thomas appeals the denial of the plenary order of protection.

¶ 2                                    BACKGROUND

¶ 3        An emergency order of protection was entered against Catherine on April 21, 2015, and extended on May 12, 2015, set to expire on June 2, 2015. Thomas sought a plenary

order of protection against Catherine, and Catherine brought a motion to dismiss. After a hearing, the court granted the motion to dismiss. The following facts are taken from the hearing[1] and pleadings below.

¶ 4          Thomas testified that he and Catherine are cousins, explaining that their fathers were brothers. Thomas saw Catherine on April 14, 2015, at a memorial service for her father, Levon Tamraz. He went to the service with his mother, his sister, and the deceased's mistress, Bea Jacobs. According to Thomas, immediately after the service, Catherine realized Bea had ridden to the service with him. Because this was her deceased father's paramour, she became angry. She left a voicemail on Thomas' telephone which was stipulated to at the hearing. The stipulation, read into evidence at the hearing, said:

> "847-946-2118; received April 14th at 9:37 p.m. Hey, Johnny. It's Cathy. I want to tell you something right now. I just found out your mother brought to my father's thing - you guys are motherf***. I'm going to tell you right now, you better all watch your f*** backs because I don't appreciate what you guys f*** pulled. You hear me? I should be calling out favors from all the f*** gangsters I have. Okay. Tell your mother watch her f*** back f*** Tamraz and I can't wait, wait, wait, wait till I see your f**king face again. Okay. Your mother's a f*** piece of s*** mother. I hope she drops dead."

Thomas testified that his mother, Grace, who was 87 years old, was in the car and heard the message. He said that he felt emotional distress when he heard the message.

---

[1]          We note here that the transcript of the hearing is exceptionally difficult to read. The parties at the hearing were argumentative and talked over one another. The court repeatedly attempted to make a good record, admonishing the parties and petitioner's attorney not to talk over one another, and the court reporter repeatedly announced she was unable to take down the testimony.

¶ 5    Over the next hour, Thomas received approximately 26 text messages from Catherine. He did not receive any more voicemails from her. The text messages, from Catherine's telephone to Thomas' telephone, are included in the record on appeal, and are the following:

"Your mother really is an evil person isn't she I really feel sorry for you guys now I understand why time he's always been arrested isn't it true they steal money out of grandma's money, boy you should be really proud of your family congratulations you guys win"

"And you also beg jimmy Bannos to teach your boys the bar business dude I know so much shit on you its not even funny"

"Such scum"

"Your trying to impress us and Chrissy we buy and sell people like u o I'm sorry I R still working"

"U t such a cunt your family are dead to us enjoy watching your father die"

"Do I know that your father used to cheat on your mom should o go on"

"Tell your don to get s hair cut and wash it"

"son"

"I hope u all die a painful slow death"

"I wish upon all of your family and your grandchildren bad luck on all your heads very bad luck the rest of their life"

"par for course class list once again and I hope your father enjoys this series going after after him because he embezzled money"

"Don't ever contact us again"

"Tell he's she is classless just like u and your family. If you were so wealthy why did my father have to get you a job in why you still working you little bitch. We bind so people like you I know your favorites always been so jealous of the Elliotts kiss my a***"

"i r dead 2 all of us"

"Isn't it funny how my dedicate your husband a job and your f*** father is a big crook"

"and you disrespected my mother I will never forgive you for that"

"You people always be classless proof is in the pudding"

"She should never of been here she's not a part of our family you people should've known better"

"Your grandchildren will not live long my prediction"

"I put the evil eye on all of you"

"And you can tell your mother she's a f*** b*** to"

"Who even invited you you people aren't even invited"

¶ 6    In his testimony, Thomas responded to a question regarding how he felt about the text messages by saying Catherine is "crazy." He also admitted that, although Catherine left an angry voicemail and sent a series of text messages while he was in his car, she did not follow him in the car nor go to his home. The messages stopped after Thomas' sister telephoned Catherine and told her they were going to show the messages to an attorney. From April 14, 2015, to the day of the hearing in June, Catherine had no contact with Thomas and did not threaten him in any way. He also explained that, although the text messages went to his telephone, some were directed at other members of his family.

¶ 7      On cross-examination, Thomas admitted that, prior to April 14, he had not seen Catherine for nine months. He admitted that he invited the deceased's mistress to ride to the memorial with his family, and did not think the deceased's family would be "upset." Catherine's counsel read through the list of text messages and asked Thomas if each one scared him. Thomas answered that no, he was not scared by most of the text messages, and considered some of the messages "a joke" and opined that Catherine's family was "a joke." Thomas testified that he was afraid, or at least "bothered" when he received the text message stating "And you can tell your mother she's a f*** b***." He was also "bothered" by the texts stating, "And you're such a c***; your family are dead to us; enjoy watching your father die" and "do you know your father used to cheat on your mom." He was also bothered but not scared when he received the message: "I hope you all die a painful and slow death" and "Your grandchildren will not live long my prediction." He was not bothered by the text saying Catherine had put the "evil eye" on him.

¶ 8      On redirect, Thomas clarified that the text "your grandchildren will not live long my prediction" made him feel scared and emotionally disturbed. Thomas testified he was very scared when he heard the voicemail.

¶ 9      Thomas' mother, Grace Tamraz, testified that she attended the deceased's memorial along with Thomas, her daughter Annette, and Bea Jacobs. Grace invited Bea to ride to the memorial with her family. She testified that after the memorial, Catherine found out that the mistress, Bea, had come to the memorial with Grace and her family. Then, Grace thought Catherine, her sister, and her aunt were "coming after" them and Grace and her family "moved fast to get into the car so they wouldn't do anything." Grace was "very much" afraid. Then, while they were all sitting in the car, Catherine telephoned Thomas on his cell phone.

She was afraid when she heard the voicemail left by Catherine. Grace did not see the text messages. On cross-examination, Grace admitted she and Thomas do not live together, but that Thomas is often at her house.

¶ 10 Catherine testified at the hearing, admitting she left the voicemail and sent the text messages in question. She explained she did it because she was upset "the Tamrazes came to my father's dedication with my father's mistress [and] was parading her around." She wanted to "make them understand how upset I was" and that "they had ruined something that could have been a really precious occasion." When asked about the "evil eye" text, she said she denied knowing what "evil eye" means. She explained she sent the texts because she was hurt and went on a "one-hour rant." When asked specifically about the part of her voicemail in which she say she can "call[] out favors," Catherine denied that she was talking about organized crime and said she does not "know anybody in that situation or that circle," explaining she was "just going off on a rant." Additionally, she denied she meant the portion about Thomas and his family watching their backs as a threat, but said it was just a rant. She explained the voicemail was not a threat, stating:

> "[WITNESS CATHERINE TAMRAZ:] If you listen to the whole thing, it was someone who was very upset that my mother, my mother's memory was ruined because these guys are to bring my father's mistress to something? Why did they have to do that? We never see these people. We have nothing to do with these people. They've never been around my family."

¶ 11 Catherine explained the texts as:

"[WITNESS CATHERINE TAMRAZ:] I was on a rant. They hurt me. They really hurt me. It was a one-hour rant over and done with and that's it. I did it. Am I sorry I did it, absolutely."

¶ 12    The trial court denied the request for an order of protection. Regarding the nature of the text messages, the court said:

"THE COURT: *** Mr. Tamraz was asked about each message. And most of the messages he agreed were not directed specifically at him. But when asked about each of the messages, many of them, he said, no, I wasn't afraid; well, I was bothered. And some he said, no, that's a joke.

None of the messages where there was some kind of threat about you're dead to all of us or you better watch your back was anything specific as to why you should watch your back, what was going to happen if you watch your back. It was a statement.

And on direct when asked how it made him feel, Mr. Tamraz, by his attorney, he said I think the girl is crazy.

When you consider all of the statements made by the respondent and as she testified - and I believe the respondent testified very credibly. She said I was upset and when – on cross-examination when she was asked, well, why did you send those messages. She said I wanted them to know how she felt.

She didn't indicate that they were designed to make the petitioner feel anything. She wanted them to understand how she felt when they brought the deceased['s] mistress there when her mother was present. And she was very upset and that she was ranting.

When asked about the evil eye. She admitted I don't know what that means, I just said it, I was just upset or I ranted."

The court noted that respondent took no action after leaving the messages that would indicate she planned to follow through with any sort of threats. The court noted there was no history of abuse, and considered these messages "at best idle threats." It considered "[m]ost of the comments [to be] insulting but not comments that would cause a reasonable person to fear for his or her safety."

¶ 13   The court noted that, when he received the messages, petitioner remained in the parking lot and did not leave immediately. It also stated:

"THE COURT: *** And more importantly, when [petitioner Thomas] said that he was fearful, *** he has no credibility. You did not testify credibly. You were argumentative. You talked over the attorney. And you kept saying that's a joke. *** So I don't believe that you were afraid or that you feared for your safety. You just kept saying, well, if you knew what she was capable of, but I have no evidence before me that she's capable of anything other than becoming very emotional and upset and making these insulting remarks.

But insults alone are not enough for an order of protection, so your request for the order of protection is denied."

¶ 14   Thomas appeals.

¶ 15                                    ANALYSIS

¶ 16   Thomas appeals, contending the trial court erred in denying the plenary order of protection. Specifically, Thomas argues that Catherine committed abuse against him, that is, the repeated text messages and the voicemail harassed him, caused him emotional distress,

and the hostile tenor of the messages reasonably led him to believe "something violent was going to happen" to him.

¶ 17     As a preliminary matter, Catherine has not filed a response brief.  Accordingly, our review is governed by *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976), in which our supreme court "set forth three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief:  (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of an appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record." *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009) (citing *Talandis*, 63 Ill. 2d at 133). We choose to address the issue here because it falls under the second category, that is, the record is simple and the issue can easily be decided without the aid of the appellee's brief.

¶ 18      The Illinois Domestic Violence Act of 1986 (the Act) (750 ILCS 60/101 *et seq*. (West 2012)), is to be construed liberally in order to "promote its underlying purposes," including preventing further abuse of victims of domestic violence.  750 ILCS 60/102 (West 2012); *Moore v. Green*, 219 Ill. 2d 470, 480-81 (2006).

¶ 19      Proceedings to obtain an order of protection are civil in nature and governed by a preponderance of the evidence standard.  *Best v. Best*, 223 Ill. 2d 342, 348 (2006); see 750 ILCS 60/205(a) (West 2012).  When a court makes a finding by a preponderance of the evidence, a reviewing court will reverse that finding only if it is against the manifest weight of the evidence.  *Best*, 223 Ill. 2d at 348-49.  "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is

unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350. Under the manifest weight of the evidence standard, we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350. As such, we will not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given the evidence, or the inferences to be drawn therefrom. *Best*, 223 Ill. 2d at 350-51.

¶ 20       Petitioner here challenges only the trial court's finding of no abuse. Section 214(a) of the Act provides that, where the trial court finds that the petitioner has been abused, it shall enter an order of protection prohibiting such abuse. 750 ILCS 60/214(a) (West 2012). The Act defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty[,] or willful deprivation." 750 ILCS 60/103(1) (West 2012). "Harassment" is defined in the Act as:

> "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner. Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:
>
> (i) creating a disturbance at petitioner's place of employment or school;
>
> (ii) repeatedly telephoning petitioner's place of employment, home or residence;
>
> (iii) repeatedly following petitioner about in a public place or places.
>
> * * *
>
> * * *

10

     (vi) threatening physical force, confinement or restraint on one or more occasions." 750 ILCS 60/103(7)(i)-(iii), (vi) (West 2012).

¶ 21   Here, the evidence showed that Catherine was angry when Thomas and his family brought Catherine's late father's mistress to Catherine's father's memorial on April 14, 2015. Immediately after, she telephoned him and left him an angry voicemail. Then, over a period of one hour, Catherine sent Thomas a series of text messages evincing displeasure over Thomas bringing Catherine's father's mistress to the memorial. The voicemail was certainly angry and insulting, including saying Catherine "should be calling out favors from all the f*** gangsters I have," and "Tell your mother watch her f*** back." The text messages were also of an angry and insulting nature, including telling Thomas his family was "dead" to her and "I hope u all die a painful slow death," wishing bad luck upon Thomas' family, predicting Thomas' grandchildren would not live long, and saying she "put the evil eye" on Thomas.

¶ 22   When asked about these messages at the hearing, Thomas alternately called Catherine "crazy," described some of the messages as "a joke," and admitted he was not scared by most of the messages. He testified that he was afraid or "bothered" when he received the text message calling his mother a foul name and was "bothered" by the text saying: "And you're such a c***; your family are dead to us; enjoy watching your father die." He testified he was bothered but not scared when he read the message: "I hope you all die a painful and slow death" and that Catherine predicted his grandchildren would not live long lives. He denied he was bothered by the "evil eye" text. Thomas testified he was very scared when he heard the voicemail.

¶ 23   For her part, Catherine admitted having left the voicemail and sent the text messages, and apologized for having done so. She explained she was "ranting" because Thomas and his

family brought her deceased father's mistress to the memorial and "paraded" her around. She explained that she wanted to "make them understand how upset I was" and that "they had ruined something that could have been a really precious occasion." She denied knowing what the "evil eye" means and stated she does not know any gangsters.

¶ 24    We see no reason to disturb the court's decision where its determination is not against the manifest weight of the evidence. See *Best*, 223 Ill. 2d at 348-49. The court specifically found Catherine a credible witness and found Thomas an incredible witness, and we do not disturb these findings. See *Best*, 223 Ill. 2d at 350-51 (We will not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given the evidence, or the inferences to be drawn therefrom). We agree with the trial court that there was no abuse here, where Catherine's voicemail and text messages, sent over a limited period of time, while of an angry and insulting nature, were not actual threats. Many were not directed at Thomas himself and, as testified to by Thomas, he was not scared by most of them. He even considered some of them "a joke" and referred to Catherine as "crazy." As he received these text messages and the voicemail, Thomas remained in Catherine's vicinity, also showing he was not fearful of his safety. And Catherine did not attempt to contact Thomas in any way after the one hour of angry messages. We find no error in the trial court's determination that a plenary order of protection should not issue.

¶ 25                                    CONCLUSION

¶ 26    For all of the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

¶ 27    Affirmed.