# Illinois Official Reports

## Appellate Court

*People v. Krisik*, 2018 IL App (1st) 161265

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD KRISIK, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1265 |
| Filed | June 15, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-7580; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Talon K. Nouri, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HALL delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1        This appeal involves the applicability of the forfeiture-by-wrongdoing hearsay exception to an accused's sixth amendment right to confrontation. We find that the trial court did not violate defendant Donald Krisik's confrontation rights by applying this hearsay exception.

¶ 2        Following a bench trial, defendant was convicted of aggravated battery and aggravated domestic battery of Michelle Ghorley. At sentencing, the trial court merged the conviction for aggravated battery into the conviction for aggravated domestic battery. Defendant was sentenced as a Class X offender to 16 years' imprisonment. Defendant now appeals his convictions and sentence.

¶ 3        Defendant argues the trial court violated his constitutional sixth amendment right to confront witnesses against him when it admitted Ghorley's prior out-of-court statements into evidence. The trial court admitted the statements under the common law doctrine of forfeiture by wrongdoing as codified in Rule 804(b)(5) of the Illinois Rules of Evidence (Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)).[1] Defendant also argues that his 16-year prison sentence is excessive. We affirm.

¶ 4                                    BACKGROUND
¶ 5        Ghorley is defendant's former girlfriend and the mother of his young child. On April 17, 2014, during an argument at the home Ghorley shared with her family, defendant accused her of cheating on him. He slapped her in the face, grabbed her by the throat, and began choking her. Defendant continued choking the victim until her sister, Star Ghorley, and a male family friend intervened and restrained defendant. Defendant left the home before the police arrived, but he was eventually arrested later the same day. Police photographs depicted bruising on Ghorley's arm and neck.

¶ 6        After his arrest, defendant's bond was set at $150,000, and he remained in custody. A petition for an order of protection was filed on Ghorley's behalf, and special conditions of bond were imposed against defendant. Specifically, defendant was ordered to stay away from Ghorley and have no further contact or communication with her.

¶ 7        Following a bond hearing on August 13, 2014, the trial court lowered defendant's bond to $90,000, but kept the bond conditions in force. The court admonished defendant that if he interfered with the alleged victim, he would remain in custody until the case was over. Defendant replied that he understood. Defendant did not post bond and remained in custody.

¶ 8        At the trial call on September 5, 2014, defendant answered ready for trial. The State answered that it was not ready for trial because it had been unable to locate Ghorley and other witnesses to serve them with subpoenas. The trial court continued the case to October 23, 2014.

¶ 9        In the interim, defendant posted bond on September 25, 2014, and was released from custody.

---

[1]Illinois Rule of Evidence 804(b)(5) provides an exception to the rule against hearsay for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). See *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 49.

¶ 10    At the October 23, 2014, court date, defense counsel answered ready for trial, but defendant requested that the trial court give him extra time to retain private counsel. The State again answered that it was not ready for trial because it had still been unable to locate Ghorley and other witnesses to serve them with subpoenas. The case was continued to November 24, 2014.

¶ 11    At the November 24, 2014, court date, private counsel was granted leave to file an appearance on behalf of defendant. Counsel made an oral motion for the public defender to tender its discovery. The matter was subsequently continued by agreement of the parties from January 2015 to April 2015.

¶ 12    At a hearing conducted on April 29, 2015, the State informed the trial court that while defendant was in custody at the Cook County jail, he violated the conditions of his bond by telephoning Ghorley on multiple occasions and meeting with her during a jail visit. The prosecutor presented audio recordings of phone calls defendant placed from the jail to Ghorley, asking her to evade service, to not attend court on the days he planned to demand trial, and to move out of state or hide out at his mother's house. Defendant told Ghorley he would arrange for her to receive money to relocate to another state. Defendant also asked Ghorley to try and convince other witnesses to lie about what they saw and to deny that he committed the alleged offenses.

¶ 13    The State informed the trial court that it intended to file a forfeiture-by-wrongdoing motion and asked the court to increase defendant's bond and take him into custody. The trial court granted the State's request to increase defendant's bond (it was increased to $300,000) and defendant was taken into custody. The court stated it was particularly troubled by allegations that defendant had offered Ghorley money "to help hide her from the prosecution." The court stated that the allegations against defendant "cut[ ] to the heart of the court process."

¶ 14    The next day, April 30, 2015, the State filed a motion, seeking to admit prior statements made by Ghorley and her sister Star. The State sought to admit a typewritten statement Ghorley gave to an assistant state's attorney (ASA) and the testimony she gave at a preliminary hearing.[2] The State also sought to admit a prior statement Star made to police.[3] The State sought to admit these statements under the doctrine of forfeiture by wrongdoing and pursuant to sections 115-10.2 and 115-10.7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.2, 115-10.7 (West 2014)).[4]

¶ 15    The State argued that in the event Ghorley failed to appear in court, despite the continuing efforts to serve her with subpoenas directing her to appear, she should be deemed unavailable based on the ground that defendant's wrongful communications with her caused her absence.

---

[2]Defendant does not challenge Ghorley's preliminary hearing testimony, which was subject to cross-examination and, thus, did not implicate his constitutional rights under the sixth amendment's confrontation clause.

[3]Because Star eventually appeared in court, the trial court limited its rulings to Ghorley's prior statements.

[4]Section 115-10.2(c) of the Code allows for the admission of hearsay statements when "the declarant persists in refusing to testify *** despite an order of the court to do so." 725 ILCS 5/115-10.2(c) (West 2014). And section 115-10.7 of the Code provides for the admissibility of prior statements of an unavailable witness whose absence was wrongfully procured. *Id.* § 115-10.7.

The State asked the trial court to find that defendant's wrongful communications with Ghorley caused him to forfeit his constitutional right to confront and cross-examine her at trial.

¶ 16 On May 6, 2015, a hearing was held on the State's motion. The parties stipulated to the unsuccessful efforts of investigators to locate and serve Ghorley and her sister Star with subpoenas. The parties also stipulated to the introduction of Ghorley's prior statements to police and the ASA and her preliminary hearing testimony. The parties further stipulated to the foundation and authenticity of audio recordings of phone calls defendant placed from Cook County jail to Ghorley and his mother.

¶ 17 The phone calls were made in April and May of 2014. The prosecutor published the audio recordings for the trial court.

¶ 18 In the first recorded phone call made on April 20, three days after his arrest, defendant spoke with his mother. He asked her to tell Ghorley not to attend court and to drop the charges. Defendant called his mother again on May 4. He complained about Ghorley testifying at the preliminary hearing. Defendant told his mother to tell Ghorley that she needed to explain to the authorities that he never choked her, but rather grabbed her by the back of her neck. Defendant's mother responded that Ghorley had agreed to tell defense counsel that she wanted to testify on defendant's behalf and say that he never choked her.

¶ 19 Defendant next called his mother on May 7. Defendant told his mother to remind Ghorley to tell his attorney that he never choked her or caused her to lose her breath. Defendant also told his mother to make sure Ghorley spoke with his attorney before speaking with the prosecutor, and to tell his attorney that she wanted to testify on his behalf and wanted to drop the charges as well as the order of protection. Defendant's mother repeatedly agreed to tell these things to Ghorley.

¶ 20 Defendant called Ghorley and spoke with her on May 8. Defendant questioned her about her meetings with his attorney and the prosecutor. Ghorley told defendant she was informed that she could not just drop the charges and that if she testified to something different, she would be impeached. Defendant told Ghorley she would have to leave the state in order for him to beat the case. Ghorley started crying, and the phone call abruptly terminated.

¶ 21 Defendant immediately called Ghorley back and asked if her sister Star had spoken to the police or given them a statement. Defendant instructed Ghorley to tell Star to testify that she let him into the residence. Ghorley responded that Star hated defendant and would not lie for him. Defendant told Ghorley about the amount of jail time he was potentially facing and told her she should avoid service and leave the state. Defendant told Ghorley he would give her $1000 to relocate and that she should remain out of state for three or four months while he demanded a speedy trial.

¶ 22 Defendant told Ghorley he was going to demand trial on his next court date and that she should leave the state from July through October or November, when the case would be over. Ghorley responded that she did not know if she could relocate. Defendant told Ghorley he was going to demand trial and that he had to be tried within 120 days. He told Ghorley that the State would try to subpoena her. Ghorley started crying and said that she could not just quit her job and move away. Defendant repeated that he would give her $1000 to relocate. Ghorley remained silent on the phone for long portions of the call.

¶ 23 Defendant's mother came on the phone. Defendant told his mother that Ghorley needed to avoid being served with subpoenas. Defendant asked his mother if Ghorley could hide out at

her house for three or four months. When Ghorley came back on the phone, defendant again implored her to help him by hiding out so she could avoid being subpoenaed. Defendant told Ghorley that the prosecution was "act[ing] like I tried to f*** murder you or something," causing Ghorley to shout back, "you did!" Defendant talked about returning home from prison when his infant son would be six years old. Ghorley told defendant, "I don't know what to do. I'm not going to be able to just up and quit my job and disappear for f***ing months." Ghorley told defendant she did not want to "uproot" her children and move somewhere else. Defendant told Ghorley that if she did not appear in court, then the prosecution would be unable to use her prior statements against him because he could not cross-examine her about the statements. Ghorley began to cry again and the call was terminated.

¶ 24 The State offered to publish additional recorded phone calls for the trial court, but the court declined, stating, "I don't need more." After hearing argument from the parties, the trial court continued the matter so it could review relevant case law before making its ruling.

¶ 25 The parties agreed to start the bench trial and take trial testimony pending the court's ruling. Ghorley's whereabouts remained unknown.

¶ 26 The first witness to testify was Jacob Jourdan, a family friend. Jourdan testified that at the time of the incident, he was living in the basement of Ghorley's home. He also knew defendant. Jourdan testified that around 9 p.m. on the date of the incident, he was in the basement watching television with Star when he heard several loud thumps, like the house was shaking. He investigated where the sounds were coming from and discovered they were coming from the top floor bedroom. Jourdan proceeded upstairs, followed by Star, where he heard a struggle and whimpering noises coming from the bedroom. He entered the bedroom and saw defendant on top of Ghorley. She was lying on the floor and defendant had his hand around her throat. Ghorley's face was turning colors and she was taking "short struggled breaths." Jourdan hit defendant, placed him in a headlock, and they started scuffling and fighting until defendant ran out of the house. Shortly after the police arrived, he saw defendant drive by the house.

¶ 27 Responding police officer Dattulo testified to events leading up to defendant's arrest. The officer testified that while he and his partner were speaking with Ghorley on the front porch of her home, she pointed to a vehicle that had just passed by. Defendant was driving the vehicle. The officers returned to their squad car and pursued the vehicle for a block before pulling it over. The officers arrested defendant and took him into custody.

¶ 28 Officer Dattulo testified that defendant looked like he had been in a fight. The officer testified that defendant told him his injuries were caused by a person named Jacob and Ghorley's sister Star.

¶ 29 At the next trial date, the trial court issued its ruling on the State's forfeiture-by-wrongdoing motion, ruling in favor of the State. The trial court stated:

"All right. I heard the evidence [and] the arguments. In my view what I heard is sufficient for me to find that the state has established by a preponderance of the evidence that the defendant is in fact engaged in activity involved [*sic*] which was Michelle Ghorley from appears [*sic*].

It appears that the since the last court date, Star Ghorley has appeared. I have heard earing [*sic*] with her on the record as to why she didn't think service of process [*sic*].

- 5 -

> But it's clear to me that the [defendant]—directly Michelle and through his mother defendant engaged in activity that allowed to grant the state request to allow the testimony of Michelle Ghorley to be entered—in the subpoenaed."[5]

¶ 30    Defense counsel asked the trial court to reconsider its ruling in light of the fact that after being questioned by the court, Star responded that she had avoided service on her own accord. The court declined to change its ruling. The court stated that Star's voluntary decision not to appear in court had no bearing on Ghorley's failure to appear.

¶ 31    The parties then stipulated that if called to testify, ASA Mikah Soliunas would testify that she and a detective met with Ghorley on April 18, 2014, at which time she gave a signed typewritten statement. In her statement, Ghorley stated that, at the time of the incident, she was living with her parents and other family members in their house. She had been dating defendant for about two and half years. They had a young son together, but were not married and did not live together. On April 17, 2014, at approximately 7 p.m., she and her children had returned home from Walgreens when she noticed a text message from defendant.

¶ 32    She looked out the window and saw defendant seated in his car parked in the alley. He was about 200 feet away from her. When she asked him what he was doing in the alley, he gave her "the finger" and drove off. She continued receiving text messages from defendant. About 45 minutes later, while Ghorley was upstairs with her son, defendant entered her room. Defendant did not respond when Ghorley asked him how he got into the house.

¶ 33    Defendant began yelling and arguing with Ghorley, accusing her of lying about where she had been. Defendant was angry that Ghorley had gone to a particular Walgreens store, and accused her of going to the store to meet a man. Defendant refused to listen when she attempted to explain to him why she went to that particular Walgreens. The argument escalated, and defendant began calling Ghorley a "whore" and other names. Defendant then slapped Ghorley on the left side of her face. Ghorley stated she was "stunned" and told defendant to leave the house, but he continued screaming at her.

¶ 34    Defendant came towards Ghorley and grabbed her by the throat with both of his hands. He lifted her up and threw her onto the floor. Ghorley got up, sat in a chair, and continued telling defendant to leave the house. Defendant then grabbed Ghorley by her hair and flipped her over in the chair. He yelled at her to "shut the f*** up and stop screaming." He shoved her down on her face, using both of his hands. Ghorley repeatedly told defendant she was concerned her son was going to fall off the bed. Defendant stopped pushing down on Ghorley's face and moved the boy toward the center of the bed.

¶ 35    Ghorley grabbed her son and told defendant to leave. He continued yelling at her and then spit on her. The argument continued and defendant eventually grabbed Ghorley by the throat again, choking her with both of his hands while she held onto her son. Ghorley felt her face getting hot as she tried hitting defendant with her free hand. Ghorley "thought she was going to die." Defendant eventually let go of Ghorley's throat. She estimated that by this time, defendant had been attacking her for about 20 minutes.

¶ 36    Ghorley continued asking defendant to leave, which he refused to do. Defendant screamed at Ghorley while she was holding her son. After a short while, defendant threw Ghorley to the floor and began choking her again. The boy started crying and screaming, and Ghorley let him

---

[5]This language is taken verbatim from the transcript of the court's ruling. The transcript appears to contain errors in diction and grammar.

- 6 -

go so she could try and get defendant off of her. The boy was in arm's reach of Ghorley during this time. Ghorley could not breathe, but did not feel any pain. As Ghorley was on the floor being choked by defendant, she heard her sister Star yell "get the f*** off of her."

¶ 37 Defendant let Ghorley go after Star hit him. At this point, a family friend, Jacob Jourdan, came into the room and restrained defendant. Ghorley grabbed her son and ran downstairs and told her mother to call the police. Defendant left the house, but before leaving, he took Ghorley's cell phone. When Star called the phone, defendant told her that Ghorley "was dead, b***."

¶ 38 The police arrived, and as Ghorley was speaking with them at the front of her house, defendant drove by and she identified him to the police. Photographs were taken depicting bruises and red marks on Ghorley's neck. Ghorley confirmed to ASA Soliunas and the police that the photographs accurately depicted how her neck appeared and that the red marks on her neck were caused by defendant choking her.

¶ 39 The State then called ASA Katherine Schoon-Dussman to publish Ghorley's preliminary hearing testimony she gave on April 24, 2014. Prior to publishing the testimony, ASA Schoon-Dussman was cross-examined by defense counsel.

¶ 40 ASA Schoon-Dussman testified that she and a victim-witness specialist spoke with Ghorley about 30 minutes prior to the preliminary hearing. ASA Schoon-Dussman testified that Ghorley was not uncooperative, but rather appeared to be your typical domestic violence victim; she was emotional, fearful, and nervous. According to the ASA, Ghorley never said that she did not want to proceed with the case. The ASA also testified that she never informed Ghorley she would be arrested for contempt if she refused to testify or that she would face possible charges if her testimony was inconsistent with her statement. ASA Schoon-Dussman testified that she "would never, ever advise domestic violence victims of that."

¶ 41 ASA Schoon-Dussman stated that Ghorley willingly and voluntarily agreed to testify. The ASA testified that Ghorley became visibly upset during her testimony and attempted to minimize what had occurred to her. On redirect-examination, ASA Schoon-Dussman clarified that the issue Ghorley was attempting to minimize was her inability to breathe when defendant was choking her.

¶ 42 The State asked for, and was given, permission to publish Ghorley's preliminary hearing testimony. Ghorley's recounting of events leading up to defendant's arrest was similar to the statements she gave in her typewritten statement; however, unlike her statement, she denied not being able to breathe when defendant was choking her. Ghorley also testified that she did not want to press felony charges against defendant because he is her son's father and she was concerned about the child not having his father around.

¶ 43 The State also published approximately seven minutes of a phone call defendant placed from Cook County jail to Ghorley on May 8, 2014. The phone call was published for the purpose of demonstrating defendant's alleged consciousness of guilt.

¶ 44 The State rested, and defendant made a motion for a directed finding, which the trial court denied. After defense counsel informed the court that he was not calling any defense witnesses, the court called Star to testify in an attempt to ascertain how defendant gained entry into the house on the date of the incident. Star testified that she did not see defendant enter the house on the date of the incident, but had seen him in the house with her sister on prior occasions.

¶ 45 Defendant subsequently declined to testify, and the defense rested.

¶ 46        Following closing arguments, the trial court found defendant guilty of aggravated battery and aggravated domestic battery. At sentencing, the court merged the conviction for aggravated battery into the conviction for aggravated domestic battery. After the court denied defendant's motion for a new trial, he was initially sentenced as a Class X offender to 17 years' imprisonment. The court subsequently lowered defendant's sentence to 16 years' imprisonment after observing that he was required to serve 85% of his sentence. This appeal followed.

¶ 47                                    ANALYSIS

¶ 48        Defendant first contends that the trial court violated his constitutional sixth amendment right to confront witnesses against him when it admitted Ghorley's typewritten statement into evidence under the doctrine of forfeiture by wrongdoing. Defendant argues the trial court erred in this regard because the State failed to prove the causation element of its forfeiture-by-wrongdoing claim. Defendant claims the State failed to prove that his alleged wrongful communications with Ghorley caused her to be unavailable so as to render her statements admissible under the forfeiture-by-wrongdoing exception to his right of confrontation under the sixth amendment. Instead, defendant contends the evidence shows that Ghorley chose to avoid service and not attend court on her own initiative.

¶ 49        The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." This part of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007).

¶ 50        The confrontation clause is primarily concerned with testimonial hearsay. *Crawford v. Washington*, 541 U.S. 36, 53 (2004). Here, the State concedes, and we agree, that the typewritten statement Ghorley made to the ASA was testimonial in nature.[6] Testimonial statements of witnesses who are absent from trial are typically barred under the confrontation clause unless the witnesses are found to be unavailable to testify and the defendant had a prior opportunity to cross-examine them. *Id.* at 53-59.

¶ 51        The common law doctrine of forfeiture by wrongdoing is an exception to the protections provided by the confrontation clause. *People v. Hanson*, 238 Ill. 2d 74, 97 (2010). This doctrine permits the introduction of testimonial hearsay statements by an unavailable witness if the trial court finds, by a preponderance of the evidence, that the defendant engaged in wrongdoing that was intended to, and did, cause the witness to be unavailable. See *People v. Peterson*, 2017 IL 120331, ¶¶ 18-19; *Stechly*, 225 Ill. 2d at 278. The doctrine is "aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of courts to protect the integrity of their proceedings.' " *Giles v. California*, 554 U.S. 353, 374 (2008) (quoting *Davis v. Washington*, 547 U.S. 813, 834 (2006)). When the State seeks to admit a statement under the forfeiture-by-wrongdoing exception to the confrontation clause, it must prove both the

---

[6]"Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

wrongdoing and that the defendant intended by his actions to cause the witness to be unavailable. *Stechly*, 225 Ill. 2d at 277; *Nixon*, 2016 IL App (2d) 130514, ¶ 49.

¶ 52    Generally, a reviewing court will not disturb a trial court's ruling on the admissibility of evidence absent an abuse of discretion. *People v. Chambers*, 2016 IL 117911, ¶ 75. However, our supreme court has adopted a preponderance of the evidence standard for resolving claims of forfeiture by wrongdoing. *Stechly*, 225 Ill. 2d at 278. Under this standard, the State need only present evidence that renders a fact more likely than not. *Peterson*, 2017 IL 120331, ¶ 37. The trial court makes factual determinations, based upon a preponderance of the evidence, as to whether defendant engaged in wrongdoing that was intended to, and did, cause the witness to be unavailable.

¶ 53    As a reviewing court, we defer to these factual findings unless they are against the manifest weight of the evidence. *Id.* ¶ 39; see also *Tamraz v. Tamraz*, 2016 IL App (1st) 151854, ¶ 19 ("When a court makes a finding by a preponderance of the evidence, a reviewing court will reverse that finding only if it is against the manifest weight of the evidence."). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 54    Based on our review of the evidence, we find the State proved, by a preponderance of the evidence, that defendant's wrongful communications with Ghorley caused her to be unavailable so as to render her statements admissible under the forfeiture-by-wrongdoing exception to defendant's right of confrontation.

¶ 55    Under the doctrine of forfeiture by wrongdoing, causation need not be established by direct evidence or testimony. *State v. Maestas*, 2018-NMSC-010, ¶¶ 40-41, 412 P.3d 79. Instead, the requisite causation may be established by inference from circumstantial evidence. *Id.* The fact that a defendant and witness were in a domestic relationship and the timing and circumstances surrounding the defendant's wrongdoing may support an inference that the wrongdoing caused the witness to be unavailable. *Id.*

¶ 56    In this case, the timing and circumstances surrounding defendant's wrongdoing support an inference that his wrongdoing caused Ghorley to be unavailable. The evidence shows that on April 24, 2014, Ghorley appeared at the preliminary hearing and testified about the defendant attacking her. It was only after these events that defendant began regularly calling his mother and Ghorley from jail in an attempt to pressure Ghorley into avoiding service, abandoning the case, and making herself unavailable during the speedy trial period. See *People v. Burns*, 832 N.W.2d 738, 745 (Mich. 2013) ("a defendant's wrongdoing *after* the underlying criminal activity has been reported or discovered is inherently more suspect, and can give rise to a strong inference of intent to cause a declarant's unavailability" (emphasis in original)). From this point on, Ghorley avoided service and failed to appear in court.

¶ 57    Based on our review of the evidence and mindful that the State's burden of proof in a hearing on forfeiture by wrongdoing is a preponderance of the evidence, we cannot say that the trial court's finding that Ghorley's typewritten statement was admissible under the forfeiture-by-wrongdoing doctrine was unreasonable, arbitrary, or not based on the evidence presented. The trial court's finding of forfeiture by wrongdoing was not against the manifest weight of the evidence.

¶ 58    Defendant next challenges his 16-year prison sentence. He argues that the sentence is excessive in light of the following: the nature of the offense, his mostly nonviolent criminal

background, and the lack of serious physical harm to the victim. We do not believe these factors warrant reduction of defendant's sentence.

¶ 59 Defendant was convicted of aggravated domestic battery by strangulation, a Class 2 felony (720 ILCS 5/12-3.3(a-5), (b) (West 2010)), with a sentencing range of three to seven years imprisonment (730 ILCS 5/5-4.5-35(a) (West 2014)), to be served at 85% under the truth-in-sentencing law (*id.* § 3-6-3(a)(2)(vii)).

¶ 60 However, because of defendant's extensive criminal history, which included numerous prior Class 2 convictions, he was subject to mandatory Class X sentencing (*id.* § 5-4.5-95(b)), and faced a prison sentence of 6 to 30 years (*id.* § 5-4.5-25(a)), to be served at 85% under the truth-in-sentencing law.

¶ 61 Imposition of a sentence is a matter of judicial discretion. *People v. Perruquet*, 68 Ill. 2d 149, 153 (1977). Where a defendant's sentence is within statutory limits, a reviewing court will not alter the sentence, absent an abuse of that discretion. *People v. Cabrera*, 116 Ill. 2d 474, 494 (1987). In the instant case, defendant acknowledges his sentence falls within the applicable statutory range.

¶ 62 Where an imposed sentence is within the statutory range, it will not be found excessive unless there is an affirmative showing that the sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). The spirit and purpose of the law are promoted when a sentence reflects the seriousness of the crime and gives adequate consideration to defendant's rehabilitative potential. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992).

¶ 63 In the present case, there is nothing in the record that indicates the trial court ignored defendant's rehabilitative potential or any mitigating factors before imposing sentence. The record indicates that, at defendant's sentencing hearing, the trial court acknowledged the presentence investigation report, raising the presumption that the court took into account defendant's potential for rehabilitation. *People v. Wilburn*, 263 Ill. App. 3d 170, 185 (1994).

¶ 64 Our review shows the trial court considered both mitigating and aggravating factors and arrived at a balance between society's need for protection and defendant's rehabilitative potential. Based on the record before us, we cannot say that defendant's sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense he committed.

¶ 65 Defendant finally argues that the trial court abused its discretion in sentencing him because the sentence was based on the court's initial misunderstanding of the sentencing structure he was subject to and on the court's improper speculation as to whether he would earn good-time credits against his prison sentence or complete his sentence without having the credits revoked. Again, we must disagree.

¶ 66 After denying defendant's motion for a new trial, the trial court initially sentenced defendant as a Class X offender to 17 years' imprisonment with 3 years of mandatory supervised release. Upon inquiring as to whether defendant was "eligible for day for day good time," the prosecutor responded to the court, "No, Judge. He is at 85 percent." Following further discussion, the trial court stated, "Well, I didn't realize it was 85. So I'm going to reduce [the sentence] to 16 years, 3 years MSR at 85 percent."

¶ 67 Defense counsel then made an oral motion to reconsider sentence, stating in part:

"[DEFENSE COUNSEL]: Your Honor, initially you had contemplated 17 years at 50 percent. Now that we have been able to have a concrete finding of 85 percent, Judge, I would respectfully ask that you consider that in light of your initial discussion. If you would reduce that to be in line with what [defendant] would have originally served under the 50 percent at 17, I think that sends a substantial message. I believe that is consistent with protecting the public and what you heard at trial."

¶ 68 The trial court responded as follows:

"THE COURT: Okay. Here is the answer to that. Although it's partially a small way what I would consider in sentencing being eligible for good time and getting good time is apples and oranges. No one can predict what someone would do in prison.

The maximum he can do is 17 years if they revoked all of his good time. Given what I know about [defendant], the likelihood that he will make it through his sentence without getting his good time revoked is minimal.

The only reason I reduced it is because upon finding that it's 85 percent I thought I would give [defendant] the benefit of that at least for a year and not more than that. So the amount of sentence someone does is up to them. It's the maximum that I'm considering. So your motion is denied."

¶ 69 As the above illustrates, none of the trial court's statements support defendant's assertions that the court's decision to sentence him to 16 years in prison was based on the court's misunderstanding of the sentencing structure defendant was subject to or speculation as to whether defendant would be eligible to earn good-time credits against his sentence or complete his sentence without having the credits revoked. The record contains no evidence showing the trial court abused its discretion in sentencing defendant to 16 years in prison for aggravated domestic battery.

¶ 70 Accordingly, for the reasons set forth above, we affirm the judgment and sentence of the circuit court of Cook County.

¶ 71 Affirmed.